IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAMUEL MITCHELL, JR. ) | |
| ) | No. 03 C 0022 |
| Plaintiff, ) | |
| ) | Judge Mark Filip |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

In this case, the plaintiff, Samuel Mitchell, Jr., ("Mr. Mitchell" or "Plaintiff"), a former inmate at the Metropolitan Correctional Center ("MCC") in Chicago, sued the United States for an alleged assault and battery at the prison. (*See* D.E. 1.) That assault and battery allegedly took place at the hands of Ms. Cyd Rogers. (*See id.*) In January 2001, the time in question, Ms. Rogers was a correctional officer at the MCC (Trial Transcript ("Tr.") at 45), and she has since been promoted to the rank of Lieutenant within the United States Bureau of Prisons. (*See id.*) As explained below, the Court finds that Mr. Mitchell failed, despite the best efforts of his counsel, to prove his case. The Court's findings of fact and conclusions of law are set forth below. To the extent any finding of fact might be deemed a conclusion of law, it should be considered as a conclusion of law. *See Quela v. Payco-General Am. Creditas, Inc.*, No. 99 C 1904, 2000 WL 656681, at *1 (N.D. Ill. May 18, 2000) (Castillo, J.). The same is true as to any stated conclusion of law. *See id.*

## LEGAL CONCLUSIONS

The Court has jurisdiction over Mr. Mitchell's assault and battery claim against the United States pursuant to the Federal Tort Claims Act ("the FTCA"). *See* 28 U.S.C. § 1346(b)(1); 28 U.S.C. §§ 2671-2680. In relevant part, the FTCA states that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Therefore, and as the parties agree, Mr. Mitchell's claim for assault and battery may proceed under the FTCA.

In rendering the verdict, the Court notes that the legal principles were not in dispute. As taken from the parties' joint pretrial order, the agreed contested issues were straightforward: first, whether Ms. Rogers's actions were willful and wanton so as to satisfy the standard of liability under the FTCA and the Illinois Local Government Tort Immunity Act, 745 ILCS 10/2-202 ("the Illinois Tort Immunity Act"), which applies to public employees performing a law enforcement function; and second, whether Ms. Rogers committed the torts of assault or battery. (*See* D.E. 30 at 2.)

FTCA claims are governed by the substantive law of the state where the alleged tort occurred. 28 U.S.C. § 1346(b)(1) (adopting the "law of the place where the act or omission occurred"). The alleged act in the present matter took place in Illinois, and therefore, Illinois law governs with respect to the claim. The FTCA directs the court to determine liability against the United States "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The "'private individual' to which the United States is analogized under Section 2674 is the corresponding public employer under Illinois law." *Estate of Warner v. United States*, 743 F. Supp. 551, 553 (N.D. Ill. 1990) (Shadur, J.); *see also Davis v.*

*United States*, No. 98 C 6251, 1993 WL 410148 (N.D. Ill. Oct. 14, 1993) (Kocoras, J.) (citing with approval to *Estate of Warner, supra*, and holding that the Illinois Tort Immunity Act applied to claims brought under the FTCA that related to actions of federal law enforcement agent, including a battery claim).[1]

Under Illinois law, a public employer is entitled to immunity from suit arising from the acts of its employees in the execution or enforcement of any laws unless the acts constitute willful and wanton conduct. *See* 745 ILCS 10/2-202, 10/2-109; *see also Smith v. City of Chicago*, 242 F.3d 737, 744 (7th Cir. 2001) (applying willful and wanton standard to claim of battery incident to arrest); *Gordon v. Degelmann*, 29 F.3d 295, 299 (7th Cir. 1994) (applying willful and wanton standard to claim of unlawful arrest). "Conduct is willful and wanton when it 'shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property.'" *Smith*, 242 F.3d at 744 (quoting 745 ILCS 10/1-210); *see also Carter v. Chicago Police Officers*, 165 F.3d 1071, 1080 (7th Cir. 1998) (same). Precedent reflects that courts should overlay the elements of the tort alleged with the requirement of willful and wanton conduct. *See, e.g., Carter*, 165 F.3d at

---

[1] In *Kaniff v. United States*, 351 F.3d 780 (7th Cir. 2003), the Seventh Circuit reserved the question of whether "state immunity rules set the standard to be applied to the federal government in an FTCA suit." *Id.* at 790. In the lower court decision in that case, Judge Pallmeyer had sided with the majority position reflected in *Estate of Warner* and circuit precedent from outside the Seventh Circuit. *Id.* The Seventh Circuit did not find it necessary to resolve whether the majority position was correct (there is at least one district court decision from New York that takes a contrary view) because the district court decision in *Kaniff* was affirmed on the grounds that there were no torts proven at all, much less willful and wanton ones. *Id.* In the instant case, this Court adopts the majority view set forth in the joint pretrial order, which has been uniformly applied by district courts in this district. Nonetheless, this case is similarly situated to *Kaniff*, in that Mr. Mitchell has failed to prove even simple assault or battery, so any additional and higher hurdles he would face in trying to prove willful and wanton misconduct are not material. Put differently, Mr. Mitchell's case fails under any standard.

1080-81 (to satisfy Illinois Tort Immunity Act, plaintiff bringing assault and battery claims was required to show that officers' conduct was willful and wanton). As explained further elsewhere, however, this willful and wanton overlay is not material in this case, where Mr. Mitchell failed to prove even simple assault or battery against Ms. Rogers or any other MCC officer or employee.

An assault is an intentional act meant to cause a reasonable apprehension of an imminent battery. *Ewing v. Budget Rent-A-Car Sys., Inc.*, No. 92 C 1714, 1993 WL 28738, at *2 (N.D. Ill. Feb. 4, 1993) (Kocoras, J.) (citation omitted). To make out a claim of battery under Illinois law, a plaintiff is required to prove that the defendant "'intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual.'" *Smith*, 242 F.3d at 744 (quoting 720 ILCS 5/12-3(a)); *accord, e.g., Bedenfield v. Shultz*, No. 01-C-7013, 2002 WL 1827631, at *9 (N.D. Ill. Aug. 7, 2002) (Coar, J.) (collecting cases); *Ewing*, 1993 WL 28738, at *2 ("[b]attery is an intentional and offensive touching to which the victim does not consent.") (citation omitted). "The gist of the action for assault and battery is malice, which implies a wrong inflicted on another with evil intent or purpose." 3 Ill.L. and Prac. Assault, Battery & Bodily Harm, § 2 (2005).

## FACTUAL FINDINGS

As an initial matter, the Court compliments all of the attorneys for their fine work, which reflected their obvious and substantial preparation. The direct and cross-examinations were focused and thoughtful, and the arguments were also well done. The case was essentially a credibility fight, although, as explained further below, on one reading of the testimony, one might fairly conclude that Plaintiff failed to present a winning case because of doubts he personally

4

harbors about whether an assault and battery occurred.

The bench trial lasted less than one day. The Court paid careful attention to the witnesses, who all testified live. In assessing the credibility of the witnesses, the Court utilized the factors reflected in the standard Seventh Circuit pattern instructions about evaluating witness credibility. *See, e.g.*, Fed. Civ. Jury Instr. 7th Circuit, § 1.13 (2005). That authority calls for the factfinder to assess all relevant circumstances that bear on a witness's ability to observe and recollect events, that bear on a witness's motive to tell the truth or not to tell the truth, to assess the demeanor of the witness while testifying, and to apply a healthy dose of common sense in trying to determine whose testimony is credible and whose testimony is not. *See, e.g., id.*

After undertaking that endeavor, the Court found in favor of the United States and against Mr. Mitchell. Despite the best efforts of Mr. Mitchell's counsel, and after hearing all of the witnesses, the Court did not find, with all respect, the case to be a close one. There was no assault or battery shown, and *a fortiori*, no willful and wanton misconduct.

On October 13, 2005, the day after the trial ended, the Court delivered an oral verdict in favor of the United States. At that time, the Court explained that it would be preparing this written ruling so as to provide record citations to facilitate appellate review, if any, concerning the verdict. This written order endeavors to provide representative record citations for all material factual conclusions; however, the Court's citation of certain portions of the trial record should not be read to suggest that those are the only supportive pieces of evidence. For certain factual conclusions, at least, there are multiple record citations that could have been offered. In addition, this written order incorporates by reference the Court's earlier oral findings of October 13, 2005, except insofar as anything in those oral findings is specifically contradicted by a

finding in this written order. If there is any such contradiction (and the Court does not believe there is), the terms of this written order control. With those background principles stated, the Court will explain the basis for its ruling and verdict.

First, at a general level, Mr. Mitchell failed to ever present or suggest *any* motive for Ms. Rogers to have engaged in an assault and battery of Mr. Mitchell, a young man who is 6' 1" and some 225 pounds. (*See* Tr. at 38.) There is no suggestion that the two individuals had any longstanding animus towards each other, or that Ms. Rogers had any reason to act with intent to assault or batter Mr. Mitchell at any time, including on the day in question.

Second, the witness testimony, including in particular the credible testimony, was entirely inconsistent with any assault and battery scenario. With regard to witness credibility, and with all respect, the Court found Mr. Mitchell to be the least credible witness in the case. The Court credits evidence that Mr. Mitchell made materially inconsistent statements about the operative events in the immediate wake of those events, including statements that were clearly false. (*See, e.g.*, Tr. 71-72; Gov. Exs. 5 & 6 (reports documenting Mitchell admissions).) These inconsistent and false prior accounts include Mr. Mitchell's claim that Ms. Rogers pushed him so as to allow room for Mr. Redick to ride in the elevator (*see* Tr. at 71; Gov. Ex. 5), notwithstanding that Mr. Redick was not working or otherwise in the MCC on the day in question. (*See* Tr. at 71; Gov. Ex. 5.) The prior false statements also include a claim that Mr. Harris, the food service supervisor, assisted in knocking down Mr. Mitchell (*see* Tr. at 72; Gov. Ex. 5), notwithstanding that Mr. Harris was situated inside a locked, fenced-off area immediately adjacent to the place where Mr. Mitchell fell (*see* Tr. at 61), such that Mr. Harris could not have been involved as Mr. Mitchell claimed. In addition, Mr. Mitchell's testimony conflicts in material ways with that of

6

the only other witness he called, Mr. Toney Ford, who was a fellow inmate at the time of the events in question. For example, Mr. Ford testified that the large group of inmates in the area at issue rushed into the elevator when it opened and when Mr. Mitchell was thrown to the ground (*id.* at 103 (discussing the "mass rush" of inmates)), whereas Mr. Mitchell implausibly maintained, inconsistent with the other credible testimony in the case, that the hungry inmates proceeded towards the open elevator in "an orderly manner." (*Id.* at 16.) As stated, the Court respectfully did not find Mr. Mitchell's testimony credible and rejects it to the extent it conflicts with the witnesses of the United States on any and every material issue.

The Court will return to its discussion of the statements and testimony of Mr. Ford, but the Court first will turn to the witnesses of the United States. The Court found the witnesses of the United States to be credible and believable, at least as to all material issues. There were, to be sure, minor inconsistencies about various points, but as every trial lawyer knows, those sorts of minor inconsistencies inevitably occur in any human endeavor. The government's witnesses were credible and the Court credits their accounts as explained in greater detail below.

The Court starts with the testimony of Mr. Ramonde Harris, a food service supervisor at the MCC for the last 19 years since he was honorably discharged from the United States Air Force. (*See id.* at 60.) In many respects, the Court found Mr. Harris to be the most reliable witness concerning what happened, largely because he had the best place from which to see critical events and because he was not in the rush of inmates trying to get into the elevator but rather, as referenced earlier, was just off to the side inside of a locked area. (*See id.* at 61.) Although that area was locked, it was locked by a chain-link gate (*id.*), so Mr. Harris had a clear view of the scene and events in front of the elevator. (*See id.* at 64.) Mr. Harris was very

credible and his testimony is certainly credited.

As Mr. Harris explained, at the time of the events in question, there was a large group of inmates that included Mr. Mitchell, and the inmates were boisterous and clearly anxious to board the elevator. (*See id.* at 62.) When the elevator opened, the inmates "stampeded" towards the elevator, and Mr. Mitchell was "pushed and then he fell to the floor." (*Id.* at 62, 63.) None of that account is consistent in any way with an assault and battery or intentional misconduct by Ms. Rogers or with willful and wanton misconduct by any federal officer. Furthermore, as Mr. Harris explained, after Mr. Mitchell fell, he was saying to his fellow inmates "[w]ho in the hell knocked me down . . .[W]hich one of you guys knocked me down," (Tr. at 63)—which also is entirely inconsistent with any idea of assault and battery by a federal officer. *See, e.g., Bedenfield*, 2002 WL 1827631, at *9 (stating that battery requires intentional or knowing conduct by defendant). Mr. Harris's account indicates that at the time of the events in question, Mr. Mitchell himself appreciated that the operative force initiating and causing his fall was the jostling of a fellow inmate or inmates as the group of prisoners was boarding the elevator.

The Court also found credible the testimony of Ms. Rogers, the correctional officer in question. The Court credits her testimony that there was a large group of relatively loud and rowdy inmates who rushed to get onto the elevator as she opened its door to take them to lunch. (*See* Tr. at 46-48.) On the basis of Ms. Rogers's testimony and all the other evidence in the case, the Court rejects any idea that she pushed or struck Mr. Mitchell with any hostile or unlawful intent or malice. It is possible—the evidence is somewhat unclear on this point—that Mr. Mitchell struck Ms. Rogers's arm after he was pushed in the back by fellow inmates and before he hit the floor. (*See id.* at 49; *see also id.* at 56.) But that at most would be incidental contact

and in no way suggests an intentional or malicious tort, as corroborated by the fact that after Mr. Mitchell fell, he was asking which of his fellow inmates pushed him to the ground. (*See id.* at 63.)

Continuing with the other witnesses for the United States, and in summary, the Court credited Lieutenant Reusch's testimony that Mr. Mitchell offered multiple and inconsistent accounts of the operative events in the wake of the fall. (*See id.* at 71-72.) Those inconsistent and shifting accounts, which as discussed earlier, included statements that were demonstrably and objectively false, materially undermined Mr. Mitchell's credibility. The Court also credited the testimony of Mr. Hubert Garvin, the Special Investigative Supervisor at the MCC, regarding statements that Mr. Ford made in the wake of the events. (*See id.* at 84-85.) According to Mr. Garvin, Mr. Ford made statements to him that indicated that the inmates were pushing each other and that the pushing precipitated Mr. Mitchell's fall. (*See id.*) Those prior statements were inconsistent with Mr. Ford's testimony, and, along with other reasons highlighted below, undermined the credibility of Mr. Ford and hurt Mr. Mitchell's case.

With respect to Mr. Ford's testimony, he also made materially inconsistent statements before trial about whether Ms. Rogers was sitting or standing when she allegedly pushed Mr. Mitchell. (*See id.* at 116-17 (highlighting discrepancies between Mr. Ford's trial testimony and his testimony during an August 2005 deposition).) That further undermined Mr. Ford's credibility. In addition, and even more important, Mr. Ford previously signed an affidavit in which he gave a materially inconsistent statement that exculpates Ms. Rogers and is inconsistent with the idea of any intentional tort and battery. (*See* Gov. Ex. 14, Aff. of Toney Ford.) At trial, Mr. Ford stated that he was known throughout the entire federal Bureau of Prisons system for his

9

legal abilities and knowledge (Tr. at 113), and, as such, he surely appreciates the significance of a sworn statement. The Court also notes that to the extent Mr. Ford implied that his affidavit was fabricated or altered (*see, e.g., id.* at 109-10, 118, 120), the Court rejects that testimony because, among other reasons, Mr. Ford acknowledges that his initials appear on the page of the affidavit with the operative substantive testimony from him. (*See, e.g., id.* at 110, 119; *see also* Gov. Ex. 14.) It hardly enhances Mr. Ford's credibility when he attempts to walk away from the sworn statement by saying that he committed perjury or offered false information to the MCC authorities because that was in his best interests so as to eliminate any risk of angering the guards. (*See* Tr. at 120-21.) In summary, on Mr. Ford's own account of things, he effectively recklessly or even knowingly gave false sworn testimony either before trial in the affidavit or at the trial itself in his testimony. Under the circumstances, and considering all the other evidence in the case, the Court cannot fairly and does not credit his testimony in favor of any assault or battery allegation.

The Court now addresses two thoughtful arguments made on Mr. Mitchell's behalf. First, it was noted that no inmates were disciplined after this incident (*see id.* at 87-88), a fact that was offered to suggest that the idea of a rush towards the elevator or inmates pushing each other before Mr. Mitchell's fall was a fabrication. (*See id.* at 125-27.) On the facts of this case, the Court respectfully rejects the suggested inference. Mr. Mitchell's own witness, Mr. Ford, conceded that the inmates rushed into and towards the elevator (*see id.* at 103), and the government's witnesses made clear that the rush occurred as well. (*See, e.g., id.* at 62.) At the same time, the evidence showed that the rush was not anything akin to a prison riot or something extraordinary like that—in which case one would reasonably expect an investigation and

disciplining of prisoners involved—but rather was the sort of garden-variety shoving and jostling among a group of young men that often occurs in the world, including in a penal institution. That sort of shoving and jostling does not usually lead to anyone getting hurt or knocked down. Given that Mr. Mitchell was largely backing away from his claim of assault after the event occurred (*see, e.g., id.* at 72), it looked like the situation had quelled without further consequence. Under the circumstances, one would expect that prison authorities such as Lieutenant Reusch could reasonably conclude that it was sensible to let things lie and not to stir up animosities between the prisoners by seeking to have other prisoners disciplined—particularly since Mitchell had not even wanted to go to the infirmary after the incident. (*See id.* at 20, 69.) An investigation and disciplining of other prisoners naturally might create unrest within the inmate population and prompt any disciplined prisoners to have a grudge against Mr. Mitchell that might invite further repercussions. So, the Court finds that the fact that no other prisoners were disciplined does not suggest that the idea of inmates pushing and shoving was a fabrication.

A second argument made on behalf of Mr. Mitchell is that one cannot place dispositive weight on the fact that few if any other inmates were willing to corroborate his account, because prisoners sometimes do not believe it is in their best interests to testify against prison personnel. (*See, e.g., id.* at 90-91, 126.) The Court does not quarrel with the idea that one must critically assess whether the absence of corroboration might be the result of the reality that prisoners (indeed, ordinary citizens) are not always eager to testify against law enforcement personnel.

Nonetheless, while this dynamic means that the Court cannot fairly discount an inmate's accusation due to the absence of corroborating evidence, it does not mean that any particular accusation of an inmate (or anyone else) is in fact true. In this case, Mr. Mitchell's testimony and

11

shifting accounts of the events in his pretrial and trial statements were not persuasive on their own terms. And the accounts of the witnesses for the United States, including Ms. Rogers and Mr. Harris, were credible. Those facts dictate a verdict in favor of the United States.

As stated earlier in this opinion, on one view of Plaintiff's testimony, one could fairly argue that Plaintiff's own concessions fatally precluded him from prevailing. Specifically, Plaintiff acknowledged on both direct and cross-examination that he could not say if the incident was, even on his view of things, an accident, which is inconsistent with any idea that this was an intentional assault and battery. (*See id.* at 22, 41.) The government takes this view of the testimony (*see id.* at 128-29), and it is not an unreasonable one.

At the same time, as Plaintiff's counsel argued, one could legitimately construe Mr. Mitchell's testimony as saying in effect—"Hey, anything is possible, but Ms. Rogers looked me in the eye and I say she shoved me and that must be an assault." Mr. Mitchell's position on this is a fair one too. So, the Court is not ruling simply on the basis of Mr. Mitchell's statements or concessions, as they might be labeled. One could fairly say that Mr. Mitchell misspoke, or that he did not exactly understand the question in the way someone else might have, or that his testimony needs to be assessed in its entirety to fully appreciate what he is saying. Nonetheless, even giving Mr. Mitchell the benefit of the doubt as to whether he concedes that he has no case, the Court finds that, after evaluating all of the testimony and evidence from the trial, Mr. Mitchell has wholly failed to prove his case or any assault or battery.

In closing, the Court finds in favor of the United States. The Court resolves all conflicts in the testimony in favor of this verdict. As stated previously, Mr. Mitchell was the least credible witness in the case. To the extent his testimony conflicts with that of the government witnesses

on any material issue, Mr. Mitchell's testimony is respectfully rejected.

The Court also notes that Plaintiff failed to prove even simple battery or assault. *See, e.g., Ewing*, 1993 WL 28738, at *2 (stating that torts of assault and battery are intentional acts). As a result, the legal question of whether he would need additionally to show willful and wanton misconduct to prevail, as reflected in the agreed statement of issues of law in the joint pretrial order, is not material. Obviously, to the extent he needed to show willful and wanton misconduct to prevail, he failed to do so.

## CONCLUSION

For the reasons stated above, the Court respectfully finds in favor of the United States and against the Plaintiff.

So ordered.

*Mark Filip*
Mark Filip
United States District Judge
Northern District of Illinois

Date: 10-26-05